**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

United States District Court
Southern District of New York

1:19-cv-11104

| | |
|---|---|
| Jonita Cummings, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Topco Associates, LLC, | |
| Defendant | |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Topco Associates, LLC ("defendant") manufactures, distributes, markets, labels and sells almondmilk beverages purporting to be characterized by and containing flavor only from vanilla under their Full Circle Market brand ("Products").

2.      The Products are available to consumers from retail and online stores of third-parties and are sold in cartons of 1 quart (32 FL OZ) and .5 gallon (64 FL OZ).

3.      The Product's front label and advertising makes direct representations with respect to its primary recognizable and characterizing flavor by the word Vanilla.[1]

---

[1] 21 C.F.R. § 101.22(i).

1



4. The back panel includes the Nutrition Facts and ingredient list.



INGREDIENTS: ALMONDMILK (FILTERED WATER, ALMONDS), EVAPORATED CANE SYRUP, TRICALCIUM PHOSPHATE, NATURAL FLAVORS, SEA SALT, GELLAN GUM, DIPOTASSIUM PHOSPHATE, XANTHAN GUM, SUNFLOWER LECITHIN, VITAMIN A PALMITATE, VITAMIN $D_2$, D-ALPHA TOCOPHEROL (VITAMIN E).

I.   Increase in Consumption of Non-Dairy, Plant-Based Milks

5.   The past decade has seen a proliferation of plant-based or non-dairy "milks" made from various agricultural commodities.

6.   The two most popular types of "plant milk" are made from soybeans and almonds.

7.   Reasons for choosing soymilk include tree nut allergies, creamier consistency, a natural source of soy protein and more B vitamins, magnesium and potassium.[2]

8.   Reasons for choosing almondmilk include soy allergies, sweeter taste, similar consistency to skim and low-fat milk, nutty flavor and higher levels of vitamin E.

9.   Recent studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts (including almonds) while 1.5 million are allergic to soy.[3]

10.   Whether due to few people being allergic to both soy and almonds or their different qualities, consumers seldom switch between the two.

11.   These plant-based beverages are often mixed with a flavoring like vanilla or chocolate to increase palatability and are either sweetened or unsweetened.

II.   Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

12.   The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[4]

13.   Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or

---

[2]   Yahoo Food, Almond Milk Vs. Soy Milk: Which Is Better?, September 5, 2014.
[3]   Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.
[4]   21 C.F.R. §169.3(c).

for its desirable aroma qualities."[5]

14.     Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[6]

15.     It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[7]

16.     This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

17.     Today, headlines tell of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[8]

18.     Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.  Food Fraud as Applied to Vanilla

19.     Vanilla is a "high-risk [for food fraud product] because of the multiple market impact

---

[5] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[6] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.
[7] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.
[8] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[9]

20.   The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[10]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[11]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |

---

[9] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[10] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[11] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, derived from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[12] |
| ➢ Compounding, Diluting, Extending | • Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[13] |
| | • "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County. |
| ➢ Ingredient List Deception[14] | • Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list<br>o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics |

---

[12] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[13] Berenstein, 423.
[14] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

- o  "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described
- o  "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food; often containing high amount of vanillin, which must be disclosed as an *artificial* flavor when paired with vanilla
- o  "Flavor Splitting" – separating the components of a "Vanilla WONF" ingredient – vanilla extract or flavoring and "(other) natural flavor" – which gives the appearance the higher quality vanilla ingredient is used by the manufacturer when it is actually a component of a flavor blend

B.  <u>The Use of Vanillin to Simulate Vanilla</u>

21.     The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

22.     First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

23.     According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[15]

24.     Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

25.     Nevertheless, disclosure of this powerful ingredient has always been required where

---

[15] Katy Severson, <u>Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor</u>, Huffington Post, May 21, 2019.

a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

C. "Natural Vanillins" are Produced in a Non-Natural Manner

26.    The past ten years have seen the introduction of vanillin ingredients that purport to be a "natural flavor," based on the raw material being a natural source and undergoing a natural production process.

27.    However, the starting material, eugenol, is subjected to high heat and high pressure in conversion to vanillin, which is actually considered by the FDA to be a synthetic method.

28.    These low-cost "natural vanillins" are produced by the ton in China, with little transparency or verification, before being delivered to the flavor companies for blending.

D. "Vanilla WONF" to Imitate Real Vanilla

29.    The global shortage of vanilla beans has forced the flavor industry to "innovate[ing] natural vanilla solutions…to protect our existing customers."[16]

30.    These "customers" do not include the impoverished vanilla farmers who are at the mercy of global conglomerates nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

31.    The flavor industry has reacted to the high vanilla prices with programs like the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified."

32.    However, whispered reports among the vanilla farmers of Madagascar have been

---

[16] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

circulating that contrary to seeking "sustainability" of vanilla, the food and flavor conglomerates are actually working in the opposite direction.

33.    This entails paying vanilla growers to destroy their crops instead of taking the cured beans to market under the guise of "diversifying" their crops to produce palm oil among other already plentiful commodities.

34.    Fewer vanilla beans means higher prices, which benefit the flavor industry because products like vanilla extract have low margins – there is no advanced synthetic biology or proprietary formula for this basic, yet multipurpose ingredient.

35.    While this conclusion is not admitted, it is apparent from comments of industry executives.

36.    According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price."

37.    The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

38.    These compounded flavors typically exist in a "black box" and "consist of as many as 100 or more flavor ingredients," blended together in a special ratio to complement and enhance the vanilla component.[17]

39.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of

---

[17] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

vanilla beans. The result is a greater consistency in pricing, availability and quality."[18]

40.    That high level executives in the flavor industry are willing to openly boast of their stratagems to give consumers less vanilla for the same price is not unexpected.

41.    This is due in part to the once influential and respected trade group for the flavor industry, The Flavor and Extract Manufacturers Association ("FEMA"), abandoning its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

42.    Though FEMA previously opposed efforts of industry to deceive consumers, over the past twenty (20) years it has cast the general public to the curb in pursuit of membership dues from its largest members.

III.    Laboratory Analysis of Vanilla Products Reveals Prevalence of Non-Vanilla Flavors

43.    Gas chromatography-mass spectrometry ("GC-MS") and high-performance liquid chromatography ("HP-LC") are scientific techniques which can detect flavor compounds and match them to a database of known compounds, similar to a fingerprint database.

44.    These methods are relevant to determining whether a product's flavoring is derived from the vanilla bean or synthetic alternatives, by recognizing the four marker compounds typically associated with vanilla and present in consistent amounts:

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

45.    Analysis of the Product and/or similar samples with similar or identical ingredients

---

[18] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.

and nutrition facts, and/or containing a "Vanilla With Other Natural Flavors" by GC-MS and/or HP-LC, has detected high levels of vanillin, the main flavor component of real vanilla.

46.   It is probable most of the vanillin detected is not from vanilla beans because (1) the ratios of the marker compounds are skewed relative to their presence in natural vanilla and/or (2) the other three marker compounds are not detectable or are present in *de minimis*, trace amounts.

IV. The Unqualified Representations as "Vanilla" are Misleading

47.   The front label (1) represents the Product's characterizing flavor is vanilla and (2) lacks any qualifying terms, confirming to consumers they contain a sufficient amount of vanilla (flavoring or extract) to independently flavor the Products.

A.   Product's Ingredient Lists Reveal Ambiguous "Natural Flavor"

48.   The unqualified, prominent and conspicuous representations as "Vanilla" is false, deceptive and misleading because the Products contain flavoring other than vanilla, as revealed by "Natural Flavors" on the ingredient list.

**INGREDIENTS:** ALMONDMILK (FILTERED WATER, ALMONDS), EVAPORATED CANE SYRUP, TRICALCIUM PHOSPHATE, NATURAL FLAVORS, SEA SALT, GELLAN GUM, DIPOTASSIUM PHOSPHATE, XANTHAN GUM, SUNFLOWER LECITHIN, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA TOCOPHEROL (VITAMIN E).

B.   Flavoring Ingredients are Typically Combined Prior to Delivery to Manufacturer

49.     When companies use vanilla and non-vanilla flavors in a product, they are typically purchased in one package or container.

50.     Reasons for doing this include: (1) having to manage fewer suppliers, (2) ensuring the vanilla and non-vanilla flavors complement each other, (3) the non-vanilla flavors are intended to resemble, simulate and enhance the vanilla flavor, (4) consistency within product batches the flavor is added to, (5) volatile nature of flavoring constituents, (6) the ability to make misleading representations with respect to a product's flavor and ingredients and (7) ease of use.

51.     When a food manufacturer receives a flavor component from a flavor supplier that consists of two or more natural flavor ingredients, it can be labeled by declaring each ingredient by its  common or usual name such as "strawberry flavor, banana flavor."[19]

52.     Flavorings are not subject to the provisions which allow for the components of an ingredient to be incorporated into the statement of ingredients in order of predominance by weight, such that when "strawberry flavor, banana flavor" is added to a fabricated food, it will be designated as "natural flavor."[20]

53.     "Natural flavor" refers to "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents" from a natural source such as plant material and can refer to combinations of natural flavors.[21]

V.     Labeling of Products as "Vanilla" or "Vanilla With Other Natural Flavors" is Misleading

54.     The ingredient most commonly used to provide flavors from vanilla and non-vanilla

---

[19] 21 C.F.R. § 101.22(g)(2).
[20] *See* 21 C.F.R. § 101.4(b)(1) ("Spices, flavorings, colorings and chemical preservatives shall be declared according to the provisions of 101.22.") *with* 21 C.F.R. § 101.22(h)(1) ("The label of a food to which flavor is added shall declare the flavor in the statement of ingredients in the following way: (1) Spice, natural flavor, and artificial flavor may be declared as "spice", "natural flavor", or "artificial flavor", or any combination thereof, as the case may be.")
[21] 21 C.F.R. § 101.22(a)(3).

natural sources is known as "Vanilla With Other Natural Flavors" or "Vanilla WONF."[22]

55.   On the ingredient list, this ingredient is often declared inconsistently and in a misleading way: "Natural Vanilla Flavor with Other Natural Flavor," "Natural Vanilla Flavor, Natural Flavor," "Vanilla Extract, Natural Flavor" "Natural Flavor, [INTERVENING INGREDIENTS] Vanilla Extract," instead of the required "Natural Flavor."

56.   21 C.F.R. § 101.22(i) sets out the requirements for non-misleading labeling of foods based on factors including (1) the presence of "natural flavor" and/or "artificial flavor which simulates, resembles or reinforces the characterizing flavor," (2) the presence of artificial flavor which does not simulate the characterizing flavor, (3) whether the natural flavor is obtained from the food ingredient represented as the characterizing flavor – i.e., does the peach flavor come from real peaches or is it synthesized from apricots? and (4) the relative amounts of the different flavor types. *See* 21 C.F.R. § 101.22(i)(1), 21 C.F.R. § 101.22(i)(2).

57.   To arrive at a declaration that is non-misleading as to the Product's flavor, it is necessary to know the components of the flavoring ingredient used.[23]

58.   In the absence of such precise information, reasonable and informed assumptions can be made which effect the non-misleading labeling of the Products.

A.   Assumption 1: Products Contain Some Vanilla and No "Artificial Flavor"

59.   To illustrate the principles, 21 C.F.R. § 101.22(i)(1)(i) considers a food which is commonly expected to contain a characterizing food ingredient, e.g., vanilla in "vanilla almondmilk" and "contains natural flavor derived from such ingredient."

---

[22] 21 C.F.R. § 101.22(i)(1)(iii); 21 C.F.R. § 101.22(i)(1)(i) ("If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food").

[23] Plaintiff is willing to have independent testing performed on the flavoring ingredient provided directly by defendant's flavor supplier.

(i) If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", *and* the food contains natural flavor derived from such ingredient [BREAK] and [an amount of characterizing ingredient insufficient to independently characterize the food], or [the food contains no such ingredient], the name of the characterizing flavor may be immediately preceded by the word "natural" and shall be immediately followed by the word "flavored" in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "natural strawberry flavored shortcake," or "strawberry flavored shortcake".

60.     The text prior to "[BREAK]" means that all foods which are subject to the flavor designations in this sub-section are (1) expected to contain a characterizing food ingredient, e.g., vanilla in "vanilla almondmilk" and (2) will contain "natural flavor derived from such ingredient."

61.     This means 21 C.F.R. § 101.22(i)(1)(i) is relevant to a product represented as "vanilla almondmilk" which, at a minimum, contains flavor derived from vanilla, the characterizing food ingredient.

62.     However, in the context of vanilla, the natural flavor *derived from the ingredient* is the characterizing ingredient, because vanilla refers to the flavoring constituents obtained through alcohol extraction from cured vanilla beans.

63.     Then, the question becomes if the vanilla almondmilk contains "[an amount of characterizing ingredient insufficient to independently characterize the food], or [the food contains no such ingredient.]"

64.     In the yellow text, a vanilla almondmilk is considered which contains insufficient vanilla to independently characterize the product.

65.     In the green text, a vanilla almondmilk is considered which contains "no such ingredient," referring to the "characterizing ingredient, e.g., strawberries in 'strawberry shortcake.'"

66.     The second half of 21 C.F.R. § 101.22(i)(1)(i) states how a food which contains such flavoring is to be labeled:

the name of the characterizing flavor may be immediately preceded by the word "natural" and shall be immediately followed by the word "flavored" in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "natural strawberry flavored shortcake," or "strawberry flavored shortcake".

67.     The result is that the characterizing flavor, "vanilla," "may be preceded by the word 'natural'": "Natural Vanilla."

68.     Whether a flavor designation begins with "Vanilla" or "Natural Vanilla," 21 C.F.R. § 101.22(i)(1)(i) requires either of these terms to "be immediately followed by the word 'flavored'": "Natural Vanilla Flavored Almondmilk" or "Vanilla Flavored Almondmilk."

69.     The reason for requiring the term "flavored" following the characterizing flavor is to prevent consumers from being misled to think the flavor of the food is contributed mainly from its characterizing food ingredient.

70.     The difference between "strawberry shortcake" and "strawberry flavored shortcake" is that the former says the strawberry flavor (in terms of the taste sensation created) comes exclusively from *real* strawberries.

71.     A food labeled as "strawberry flavored shortcake" may or may not have real strawberries.

72.     However, the strawberry flavor (taste) experienced by a consumer will be imparted by a flavor (liquid solution) which was extracted and synthesized *from* real strawberries.

73.     The source of flavoring in a food is a material fact which consumers base their purchasing decisions on.

74.     Assuming the Products contain natural flavor from vanilla (vanilla extract or vanilla flavoring), it is plausible and likely the amount of vanilla is insufficient to independently characterize the food because:

     (1) vanilla's high price means flavor companies are using as little vanilla as possible and

substituting with "other natural flavors" and other flavoring substances like maltol and piperonal to save money, but still charging consumers the same price;

(2) flavor companies such as Givaudan, Symrise and International Flavors & Fragrances ("IFF") refuse to disclose their flavor blends to any third-parties, including their customers;

(3) flavor companies are exempt under a loophole allowing them to conceal the composition of their flavors;

(4) companies are generally incentivized to provide *de minimis* amounts of "called out," valuable ingredients because there are no requirements for stating a product has a certain ingredient, even if said ingredient is present in trace or non-detectable amounts;

(5) the high levels of vanillin in light of the absence or *de minimis* levels of the other three vanilla marker compounds is indicative of at most, a small amount of vanilla; and

(6) the skewed ratios of vanilla marker compounds which are detectable.

**B.** Assumption 2: The Product Contains No Vanilla

75.    Scientific analysis performed utilizing GC-MS and/or HP-LC has determined that in other similar products which are substantially similar or identical to the Products based on their nutrition facts and ingredient list, real vanilla may not be present or is present but at non-detectable levels.

76.    In a "vanilla almondmilk" where "none of the natural flavor used in the food is derived from the product whose flavor is simulated," vanilla, it is required to be designated "artificially flavored vanilla almondmilk." *See* 21 C.F.R. § 101.22(i)(1)(ii).

C.  Assumption 3: The Products Contain Some Vanilla But Also Contain Reinforcing Flavors

77.     Assuming the Product contains some vanilla and "other natural flavor which simulates, resembles or reinforces the characterizing [vanilla] flavor," a non-misleading description would be "Natural Vanilla Flavored Almondmilk With Other Natural Flavors" or "Vanilla Flavored Almondmilk With Other Natural Flavors." *See* 21 C.F.R. § 101.22(i)(1)(iii).

78.     However, because the exclusively vanilla ingredients "are standardized foods and these products are expensive," it is necessary that such a flavor combination be distinguished from other similar products, the name should be accompanied by a statement disclosing the flavoring strength contributed by vanilla and non-vanilla flavors.  *See* Exhibit "A," FDA Letter, Quinn to Molina, 1980.

D.  High Levels of Vanillin Implicate Front Label Designation of Products

79.     The requirements for accurate, non-misleading flavor designation at 21 C.F.R. § 101.22(i)(1)(i)-(iii) are based on the absence of any "artificial flavor which simulates, resembles or reinforces the characterizing flavor." *See* 21 C.F.R. § 101.22(i)(1).

80.     Lab analysis of substantially similar products has indicated there is a high likelihood the Products contain added vanillin.

81.     This means the labeling for such ingredients and foods containing them is controlled by the vanilla standards as opposed to the general flavoring regulations, wherever there is a conflict between them.

82.     In the context of vanilla, vanillin has always been an "artificial flavor" regardless of it is labeled "natural vanillin."

83.     Where a vanilla-vanillin combination ingredient is used, it is required to be designated on the ingredient list and "followed immediately by the statement 'contains vanillin,

an artificial flavor (or flavoring).'" *See* Vanilla-vanillin extract at 21 C.F.R. §§ 169.180(b).[24]

84.    These requirements for the use of vanilla and vanillin were established to prevent consumers from being misled by products similar to those contained in the Product – to prevent the "spiking" of a miniscule amount of real vanilla with artificial, synthetic vanillin.

85.    The implication of added vanillin for the front label is that it is required to be declared as part of the product name: Artificially Flavored Vanilla Almondmilk. *See* 21 C.F.R. § 101.22(i)(2) ("If the food contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name(s) of the characterizing flavor, in letters not less than one-half the height of the letters used in the name of the food and the name of the characterizing flavor shall be accompanied by the word(s) "artificial" or "artificially flavored", in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "artificial vanilla"").

VI.    Conclusion

86.    The proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Product because it is more expensive and desired.

87.    The representations are misleading because the Product does not contain the amount, type and/or percentage of vanilla as a component of its flavoring, which is required by law and consistent with consumer expectations.

88.    Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

---

[24] *See also* 21 C.F.R. § 169.181(b), § 169.182(b) (similar declarations required for Vanilla-vanillin flavoring and Vanilla-vanillin powder).

89.    The Product contains other representations which are misleading and deceptive.

90.    As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $4.39 per 32 FL OZ, excluding tax – compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

91.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

92.    Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

93.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

94.    This is a reasonable assumption because defendant's Product is sold in thousands of stores across all 50 states.

95.    Plaintiff Jonita Cummings is a citizen of New York.

96.    Defendant Topco Associates, LLC is a Delaware limited liability company with a principal place of business in Elk Grove, Cook County, Illinois and upon information and belief, at least one member of defendant is not a citizen of New York.

97.     Defendant is a citizen of Delaware and Illinois.

98.    This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

99.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

100.   A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

101.   Plaintiff Jonita Cummings is a citizen of Bronx County, New York.

102.   Defendant is a Delaware limited liability company with a principal place of business in Elk Grove, Cook County, Illinois.

103.   During the class period, plaintiff purchased one or more of the Product identified herein, in his or her district and/or state, for personal use, consumption or application based on the above representations, for no less than the price indicated, *supra*, excluding tax,

104.   Plaintiff would consider purchasing the Product again if there were assurances that the Product's representations were no longer misleading.

Class Allegations

105.   The classes will consist of all consumers in New York and the other 49 states and a nationwide class where applicable.

106. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff and class members are entitled to damages.

107.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same representations.

108.   Plaintiff is an adequate representative because his or her interests do not conflict with other members.

109.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

110.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

111.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

112.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

113.  Plaintiff asserts causes of action under the consumer protection statutes of New York, General Business Law ("GBL") §§ 349 & 350.

114.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

115.  Plaintiff and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

116.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

117.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and only contain said ingredient to flavor the Product.

<u>Negligent Misrepresentation</u>

118.  Plaintiff incorporates by reference all preceding paragraphs.

119.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products through misrepresenting the amount, quantity and/or proportion of the flavoring ingredient.

120.  Defendant had a duty to disclose and/or provide non-deceptive labeling of the

Product and its components and ingredients, and knew or should have known same were false or misleading.

121. This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

122. The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

123. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

124. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

125. Plaintiff incorporates by reference all preceding paragraphs.

126. Defendant manufactures and sells products which purport to contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and only contained the highlighted ingredient to flavor the Product, which is desired by consumers.

127. The Product warranted to Plaintiff and class members that it possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which it did not due to the amount and/or type of the aforementioned ingredient.

128. Defendant had a duty to disclose and/or provide a non-deceptive description and identification of the Product and its ingredients.

129. This duty is based, in part, on defendant's position as one of the most recognized

companies in the nation in this sector.

130.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

131.  The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

132.  Plaintiff and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

133.  Plaintiff incorporates by references all preceding paragraphs.

134.  Defendant's purpose was to sell a product which purported to contain valuable and desired characterizing ingredients and/or flavors, and represent the Products were exclusively flavored by the designated ingredients and contained sufficient independent amounts of same.

135.  Defendant's fraudulent intent is evinced by its failure to accurately indicate the Products contained less of the desired ingredient or none at all.

136.  Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

137.  Plaintiff incorporates by reference all preceding paragraphs.

138.  Defendant obtained benefits and monies because the Product were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   December 4, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

1:19-cv-11104
United States District Court
Southern District of New York

Jonita Cummings, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Topco Associates, LLC,

Defendant

## Class Action Complaint

```
            Sheehan & Associates, P.C.
             505 Northern Blvd., #311
               Great Neck, NY 11021
                Tel: (516) 303-0552
                Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  December 4, 2019

/s/ Spencer Sheehan
Spencer Sheehan