Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
spencer@spencersheehan.com

(*Additional Counsel on Signature Page*)

United States District Court
Southern District of New York

1:19-cv-11104-RA

| | |
|---|---|
| Glynis Wynn, Katelynn Edgerly, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| - against - | First Amended Class Action Complaint |
| Topco Associates, LLC, | |
| Defendant | |

Plaintiffs by attorneys allege upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.    Topco Associates, LLC ("defendant") manufactures, distributes, markets, labels and sells vanilla almondmilk purporting to be flavored only with vanilla under the Full Circle Market brand ("Product").

2.    The Product is available to consumers from retail and online stores of third-parties and is sold in cartons of 32 OZ and 64 OZ.

3.    The relevant front label representations include "Full Circle Market," "Vanilla" and "Almondmilk."

1



4.     The representations are misleading because although the characterizing flavor is represented as vanilla, its flavor is not derived exclusively from vanilla beans and contains undisclosed artificial flavors.

5.     Today's consumers are especially attentive to the foods and beverages they consume.

6.     62% of consumers surveyed by Nielsen say they try to avoid artificial flavors.[1]

---

[1] Nielsen, Reaching For Real Ingredients: Avoiding The Artificial, Sept. 6, 2016.

7.    Another study by New Hope Network concludes that "71% of consumers today are avoiding artificial flavors."[2]

8.    Label Insight, a marketing company focused on consumer products, determined that 76% of consumers avoid products with artificial flavors.[3]

I.    "Vanilla" Without Qualification Tells Consumers All of Product's Flavor and Vanilla Taste is from Vanilla Beans

9.    If a product makes a representation as to its primary flavor, the common or usual name is required to designate the source and amount of flavor in a specific way so that consumers will not be misled:

> If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor…

21 C.F.R. § 101.22(i)(1).

10.    These regulations have been adopted in their entirety and without modification by New York State, through the regulations accompanying N.Y. AGM Article 17:

> the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(3) Part 101 of title 21 of the Code of Federal Regulations, containing the Federal definitions and standards for Food Labeling (including Appendices) at pages 10-172.

> 1 NYCRR 259.1(a)(3) contained in Section 259.1 ("Packaging and labeling of food.")

11.    Vanilla products are the only flavorings subject to standards of identity.  *See* 21

---

[2] Alex Smolokoff, [Natural color and flavor trends in food and beverage](), Natural Products Insider, Oct. 11, 2019.
[3] Thea Bourianne, [Exploring today's top ingredient trends and how they fit into our health-conscious world](), March 26-28, 2018.

C.F.R. Part 169 ("Food dressings and flavorings"); 21 C.F.R. §169.3 ("Definitions"); 21 C.F.R. § 169.175 – 21 C.F.R. § 169.182 (vanilla products); *see also* 1 NYCRR § 250.1(a)(17) ("the commissioner hereby adopts the following as the standards of identity and/or standards of quality, and tolerances for food and food products as published in title 21 of the Code of Federal Regulations…21 CFR part 169, containing the Federal definitions and standards for *Food Dressings and Flavorings* at pages 600-606.") (italics in original).[4]

12.    Federal regulations require that a food which is not subject to a standard of identity is required to bear a "common or usual name of a food" which "accurately identif[ies] or describe[s], in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." *See* 21 C.F.R. § 102.5(a).

13.    The "common or usual name" requirement is incorporated in its entirety and without modification through the regulations accompanying N.Y. AGM Article 17:

> the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(4) Part 102 of title 21 of the *Code of Federal Regulations*, containing the Federal definitions and standards for Common or Usual Name for Nonstandardized Foods at pages 173-180.

> 1 NYCRR § 259.1(a)(4), Section 259.1, Packaging and labeling of food, Part 259, Packaging and labeling of food, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.

14.    New York State has adopted and incorporated in its entirety, all provisions of the Federal Food, Drug and Cosmetic Act ("FFDCA") through its Agriculture and Markets Law ("AGM") and the accompanying regulations. *See* Title 1, Department of Agriculture and Markets, Official Compilation of Codes, Rules and Regulations of the State of New York ("NYCRR").

---

[4] 1 NYCRR § 250.1(a)(17), Section 250.1, Foods, Part 250, Definitions and Standards, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.

15.    If the labeling of organic vanilla soymilk is inconsistent with the federal standards, then it also violates what New York requires.

I.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

16.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla,

17.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[6]

18.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[7]

II.    Requirements for Food Labeling to Prevent Consumer Deception

19.    New York State has adopted and incorporated in its entirety, all provisions of the Federal Food, Drug and Cosmetic Act ("FFDCA") through its Agriculture and Markets Law ("AGM") and the accompanying regulations. *See* Title 1, Department of Agricutlure and Markets, Official Compilation of Codes, Rules and Regulations of the State of New York ("NYCRR").

20.    Vanilla products are the only flavorings subject to standards of identity.  *See* 21 C.F.R. Part 169 ("Food dressings and flavorings"); 21 C.F.R. §169.3 ("Definitions"); 21 C.F.R. § 169.175 – 21 C.F.R. § 169.182 (vanilla products); *see also* 1 NYCRR § 250.1(a)(17) ("the commissioner hereby adopts the following as the standards of identity and/or standards of quality,

---

[6] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[7] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

and tolerances for food and food products as published in title 21 of the Code of Federal Regulations…21 CFR part 169, containing the Federal definitions and standards for *Food Dressings and Flavorings* at pages 600-606.") (italics in original).[19]

21.     Prior to adoption of vanilla standards under the Federal Food Drugs & Cosmetic Act ("FFDCA") during the era of the "Pure Food Laws," "the widespread and exceedingly serious adulteration of vanilla extracts that are now labeled 'pure'…deprive[d] the consumer of value the product is represented to have, and for which the consumer pays.[20]

22.     These practices were chronicled in Notices of Judgment issued by the Department of Agriculture against manufacturers who passed off imitation vanilla products:

> Misbranding was alleged for the further reason that the product was labeled and branded so as to deceive and mislead the purchaser thereof, in that said label was calculated and intended to create the impression and belief in the mind of the purchaser that the product was a genuine vanilla extract, whereas, in fact, it was a mixture of vanilla extract, vanillin, and coumarin, artificially colored with caramel.

> Notice of Judgment No. 2241, Adulteration and Misbranding of…Vanilla Extract, United States Department of Agriculture, W. M. Hays, Acting Secretary, Washington, D.C., January 23, 1913.

23.     The vanilla standards were intended to "insure, for the protection of both the consumers and our industry, that all vanilla products are correctly labeled and meet at least minimum standards."[21]

24.     The objective basis for the standards is the requirement that a "*unit of vanilla constituent* means the total sapid and odorous principles extractable from one unit weight of vanilla

---

[19] 1 NYCRR § 250.1(a)(17), Section 250.1, Foods, Part 250, Definitions and Standards, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.
[20] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Memorandum of Telephone Conversation between Mr. Alfred Daibock, Commercial Policy Division, Department of State and Tom Bellis, Food Standards Branch, FDA (the FDA stated, "The prime purpose sought to be served by the standards adopted was to promote honest, fair dealing with housewives and other consumers of the flavorings covered by the standards").
[21] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Press Release U.S. Department of Health, Education, and Welfare, September 13, 1963.

beans," or 13.35 ounces.[22]

25.    Federal regulations require that a food which is not subject to a standard of identity is required to bear a "common or usual name of a food" which "accurately identif[ies] or describe[s], in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." *See* 21 C.F.R. § 102.5(a).

26.    The "common or usual name" requirement is incorporated in its entirety and without modification through the regulations accompanying N.Y. AGM Article 17:

> the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(4) Part 102 of title 21 of the *Code of Federal Regulations*, containing the Federal definitions and standards for Common or Usual Name for Nonstandardized Foods at pages 173-180.
>
> 1 NYCRR § 259.1(a)(4), Section 259.1, Packaging and labeling of food, Part 259, Packaging and labeling of food, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.

27.    If a product makes a representation as to its primary flavor, the common or usual name is required to designate the source and amount of flavor in a specific way so that consumers will not be misled:

> If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor…
>
> 22 C.F.R. § 101.22(i)(1).

28.    These regulations have been adopted in their entirety and without modification by New York State, through the regulations accompanying N.Y. AGM Article 17:

---

[22] 21 C.F.R. §169.3(c) referencing 21 C.F.R. §169.3(b).

the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(3) Part 101 of title 21 of the Code of Federal Regulations, containing the Federal definitions and standards for Food Labeling (including Appendices) at pages 10-172.

1 NYCRR 259.1(a)(3) contained in Section 259.1 ("Packaging and labeling of food.")

29.   The result is that New York State labeling requirements for an vanilla almondmilk are identical to those established by the FDA.

30.   If the labeling of vanilla almondmilk is inconsistent with the federal standards, then it also violates what New York requires.

III.   "Vanilla" Without Qualification Tells Consumers All of Product's Flavor and Vanilla Taste is from Vanilla Beans

31.   Vanilla's unique flavor and aroma is due to at least 200 compounds scientists have identified.[29]

32.   These include volatile constituents such as "acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls."

33.   The non-volatile constituents include "tannins, polyphenols, free amino acids and resins."

34.   Re-creating the complexity and richness of "vanilla flavor" provided by vanilla beans is a task that science has been unable to duplicate, which is why consumers are willing to pay more for products labeled solely with the term "Vanilla."

---

[29] Arun K. Sinha et al., "A comprehensive review on vanilla flavor: extraction, isolation and quantification of vanillin and other constituents," International Journal of Food Sciences and Nutrition 59.4 (2008): 299-326.

35.    Consumers expect the Product's flavor to be supplied only from the characterizing food ingredient of vanilla beans because they are accustomed to seeing labels with terms such as "flavored," "artificial flavors" and "with other natural flavors." *See* 21 C.F.R. § 101.22(i)(1)(i) ("e.g., 'natural strawberry flavored shortcake,' or 'strawberry flavored shortcake'."); 21 C.F.R. § 101.22(i)(1)(ii) and 21 C.F.R. § 101.22(i)(2) ("artificially flavored"); 21 C.F.R. § 101.22(i)(1)(iii) ("with other natural flavor").

A.    <u>Product Misleads Consumers Because it Contains Undisclosed Artificial Flavors and Non-Vanilla Flavors</u>

36.    Despite the front label, the Product contains artificial flavors and non-vanilla flavors, which provide its vanilla taste, in contrast to the expectation that all of its vanilla taste was provided by vanilla beans.

37.    The artificial flavors and non-vanilla flavors not disclosed on the front label are evident through an analysis of the ingredient list and gas-chromatography mass spectrometry ("GC-MS").

38.    The ingredient list designates "Natural Flavors" as the only flavoring ingredient.



**INGREDIENTS:** ALMONDMILK (FILTERED WATER, ALMONDS), EVAPORATED CANE SYRUP, TRICALCIUM PHOSPHATE, NATURAL FLAVORS, SEA SALT, GELLAN GUM, DIPOTASSIUM PHOSPHATE, XANTHAN GUM, SUNFLOWER LECITHIN, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA TOCOPHEROL (VITAMIN E).

39.    "Natural Flavors" does not refer to an exclusively vanilla ingredient for several

9

reasons.

40.    All ingredients are required to be "listed by common or usual name." S*ee* 21 C.F.R.

§ 101.4(a)(1).

41.    Where only vanilla is the source of a flavor, it is required to "bear[s] the name of the

food specified in the definition and standard." *See* 21 U.S.C. §343(g)

42.    The common or usual name for the exclusively vanilla ingredients are "vanilla

extract" and "vanilla flavoring." *See* 21 C.F.R. § 169.175 (b)(1) ("The specified name of the food

is 'Vanilla extract' or 'Extract of vanilla'"); 21 C.F.R. § 169.177 (b) ("The specified name of the

food is 'Vanilla flavoring'.").

43.    Where an ingredient has "no representation as to definition and standard of identity,"

such as a combination of flavors, they "may be designated as spices, flavorings, and colorings

without naming each." *See* 21 U.S.C. § 343(i); *see also* 21 C.F.R. § 101.22(h)(1) ("The label of a

food to which flavor is added shall declare the flavor in the statement of ingredients in the

following way…Spice, natural flavor, and artificial flavor may be declared as 'spice', 'natural

flavor', or 'artificial flavor.'").

44.    The common or usual name for a flavor ingredient that contains vanilla *and* non-

vanilla natural flavors is "Natural Flavor." *See* 21 C.F.R. § 101.4(b)(1) ("Spices, flavorings,

colorings and chemical preservatives shall be declared according to the provisions of 101.22.").

45.    Though non-vanilla flavors on finished products "are labeled as either natural or

artificial," the labeling "is different – as well as highly regulated – at the industrial level so that

the end user, the processor, knows the flavor source."[30]

46.    Vanilla WONF refers to an ingredient that contains *some* vanilla and "other natural

---

[30] Donna Berry, Playing the natural flavor game, Food Business News, Jan. 1, 2018.

flavors" from non-vanilla sources "which simulates, resembles or reinforces the characterizing flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) ("If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words 'with other natural flavor'").

47.   According to Suzanne Johnson, vice president of research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

48.   The head of "taste solutions" at Irish conglomerate Kerry plc, urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

49.   A compounded vanilla ("WONF") flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[31]

50.   These compounded "WONF" flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including "naturally produced vanillin," maltol and piperonal, blended together so that consumers believe what they are tasting is real vanilla.[32]

---

[31] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[32] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

B. GC-MS Analysis Reveals *de minimis* Amount of Vanilla but High Levels of Artificial Vanilla Flavoring

51.    The application of gas chromatography-mass spectrometry ("GC-MS") can identify small and volatile compounds, such as aromatics, benzenes and alcohols, which are present in vanilla and other flavors.

52.    Though GC-MS can identify more than 150 compounds which comprise vanilla, the "main vanilla flavor backbone of commercial vanilla species" is constituted by the so called marker compounds, identified below.[33]

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

53.    The presence and amount of these compounds are "used as an indicator of quality of commercial vanilla to detect adulteration of beans and extracts."[34]

54.    GC-MS can reveal the adulteration of vanilla through "an abnormal excess of vanillin relative to the profile of minor components in a vanilla preparation."[35]

55.    In analyzing defendant's vanilla almondmilk, the sample was purged with inert gas, causing the volatile aromatic compounds to be extracted.

---

[33] ThermoFisher Scientific, Gas Chromatography Mass Spectrometry (GC/MS) Information; Arun K. Sinha et al. "A comprehensive review on vanilla flavor: extraction, isolation and quantification of vanillin and others constituents," International Journal of Food Sciences and Nutrition 59.4 (2008): 308; 299-326.

[34] Maria del Pilar Galeas, "Gas chromatography-mass spectrometry and gas chromatography-olfactometry analysis of aroma compounds of vanilla pompona schiede," Diss. Rutgers University-Graduate School-New Brunswick, 2015 citing A.S. Ranadive, Vanilla-cultivation, curing, chemistry, technology and commercial product. In: Spices Herbs and Edible Fungi. Charalambous, G. (Ed), Developments in Food Science, Vol. 34, Elsevier Science Publishers BV, Amsterdam, The Netherlands, pp 517-577 (1994).

[35] Sinha at 319-20 ("Adulteration can be detected chromatographically by an abnormal excess of vanillin relative to the profile of minor components in a vanilla preparation, but again the possibility is there to manipulate this profile artificially.").

56.    These compounds were run through capillary columns and eluted at different times before reaching the mass spectrometer.

57.    The mass spectrum plots the compounds' elution time on the X-axis and the amount or intensity of the compounds on the Y-axis.  Exhibit "A," GC-MS Report, June 4, 2020.

## Chromatogram



TSQA4078
Type: Unknown ID: 1 Row: 1
Sample Name:              Full Circle Market Vanilla Almond Milk (Production Code:
                         9321P4F2A), DCM Extract, 150C/30min, matrix spiked with
                         w/w 1.0ppm Int. Std. by P&T-TD-GC-MS
Study:
Client:                  Sheehan & Associates, P.C., LLN7716
Laboratory:              Mass Spectrometry – Dr. Tom Hartman
Company:
Phone:
Instrument Method:       C:\Xcalibur\methods\voc45solventdelay8min.meth
Processing Method:
Vial:                    1
Injection Volume (µl):   10.00
Sample Weight:           0.00
Sample Volume (µl):      0.00
ISTD Amount:             0.00
Dil Factor:              1.00

58.    The peak assignment table identifies the compounds in column three by matching their mass-to-charge (m/z) ratio with mass spectral libraries of all known compounds.

59.    Columns two (Area Integration) and four (concentration parts per million or "Conc. PPM w/w.") show the relative amounts of the detected compounds.

## Peak Assignment Table

### Table 1

**Sheehan & Associates, P.C., Project #7716**
**Full Circle Market Vanilla Almond Milk**
**Production Code: 9321P4F2A**
**Methylene Chloride Extract of 10.0 g with 1 ppm Matrix-Spiked Int. Std. by P&T-TD-GC-MS**

Data File = TSQA4078

| MS Scan # | Area Integration | Peak Assignment | Conc. PPM w/w |
|---|---|---|---|
| 42 | 34552 | diacetyl | 0.0194 |
| 98 | 57097 | acetic acid | 0.0321 |
| 236 | 555182 | acetoin | 0.3123 |
| 270 | 31316 | 1,2-propylene glycol | 0.0176 |
| 313 | 9403 | butyric acid | 0.0053 |
| 343 | 63371 | hexanal | 0.0356 |
| 388 | 15225 | furfural | 0.0086 |
| 412 | 9187 | furfuryl alcohol | 0.0052 |
| 420 | 63271 | butanediol isomer | 0.0356 |
| 429 | 23338 | pentanoic acid + hexyl alcohol | 0.0131 |
| 457 | 6999 | 2-heptanone | 0.0039 |
| 473 | 6457 | heptanal | 0.0036 |
| 494 | 32134 | 2,5-dimethylpyrazine | 0.0181 |
| 546 | 107822 | hexanoic acid | 0.0606 |
| 559 | 33035 | benzaldehyde + phenol | 0.0186 |
| 569 | 4707 | 6-methyl-5-hepten-2-one | 0.0026 |
| 579 | 34328 | 2-pentylfuran | 0.0193 |
| 592 | 17990 | octanal | 0.0101 |
| 599 | 13414 | 2-ethyl-5-methylpyrazine | 0.0075 |
| 605 | 16088 | 1H-pyrrole-2-carboxaldehyde | 0.0090 |
| 624 | 138691 | cyclotene | 0.0780 |
| 636 | 32460 | benzyl alcohol | 0.0183 |
| 658 | 126907 | heptanoic acid | 0.0714 |
| 664 | 148390 | 2-acetylpyrrole | 0.0835 |
| 677 | 88522 | gamma-hexalactone | 0.0498 |
| 686 | 5242 | 2-nonanone | 0.0029 |
| 694 | 93338 | guaiacol | 0.0525 |
| 745 | 47313036 | maltol | 26.6120 |
| 763 | 931289 | octanoic acid | 0.5238 |
| 770 | 392380 | benzoic acid | 0.2207 |
| 806 | 31871 | decanal | 0.0179 |
| 817 | 1777881 | naphthalene-d8 (internal standard) | 1.0000 |
| 836 | 52898 | hydroxy methyl furfural (HMF) | 0.0298 |
| 858 | 1646192 | nonanoic acid | 0.9259 |
| 866 | 98616 | gamma-octalactone | 0.0555 |
| 896 | 44064 | 2,4-decadienal | 0.0248 |
| 919 | 193583 | 2,4-decadienal | 0.1089 |
| 943 | 191261 | decanoic acid | 0.1076 |
| 960 | 9002119 | piperonal | 5.0634 |
| 964 | 54653 | gamma-nonalactone | 0.0307 |
| 1026 | 114911096 | vanillin | 64.6337 |
| 1081 | 47518 | acetovanillone | 0.0267 |
| 1092 | 11323 | 3,4-dihydroxybenzaldehyde | 0.0064 |
| 1096 | 6602 | delta-decalactone | 0.0037 |
| 1111 | 47475 | lauric acid | 0.0267 |
| 1122 | 7704 | 3,4-dihydroxy-5-methoxybenzaldehyde | 0.0043 |
| 1212 | 25909 | syringealdehyde | 0.0146 |
| 1231 | 150136 | thiamine vitamin decomposition product | 0.0844 |
| 1257 | 36317 | delta-dodecalactone | 0.0204 |
| 1271 | 36595 | myristic acid | 0.0206 |
| 1428 | 252764 | piperonal glyceryl acetal | 0.1422 |
| 1450 | 127622 | piperonal glyceryl acetal | 0.0718 |
| 1457 | 67514 | delta-tetradecalactone | 0.0380 |
| 1492 | 14367 | vanillin glyceryl acetal | 0.0081 |
| 1499 | 10461 | ethyl palmitate | 0.0059 |
| 1645 | 25869 | methyl linoleate | 0.0146 |
| 1651 | 105860 | methyl oleate | 0.0595 |
| 1749 | 33693 | ethyl linoleate | 0.0190 |
| 1756 | 88338 | ethyl oleate | 0.0497 |
| | | **Total (excluding internal standard)** | **99.9660** |

60.   Defendant's vanilla almondmilk reveals vanillin (MS Scan # 1026, 64.6337 PPM)

yet fails to reveal *any* of the other marker compounds for vanilla – p-hydroxybenzaldehyde, p-hydroxybenzoic acid or vanillic acid.

61.     The Product also contains maltol (MS Scan # 745, 26.6120 PPM), an artificial flavor. *See* 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").[36]

62.     Maltol fills the role of coumarin, which was used to boost the vanilla taste of a food which contained minimal or no real vanilla, before it was banned for toxicity.[37]

63.     Though maltol does not contribute a flavor of its own, it is used to enhance and substitute for real vanilla, by increasing the sweetness of a food or beverage.

64.     Though maltol has been detected in vanilla, it will be present at levels no greater than one-half of one percent of the amount detected, which means it was added to the "Natural Flavor."

65.     The Product also contains the artificial flavor piperonal (heliotropine), not found in vanilla (MS Scan # 960, 5.0634 PPM). *See* 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").[38]

66.     Piperonal is "often cast in a leading role by the flavor industry" and is  "somewhat reminiscent of hay and vanilla, with a distinct floral, powdery edge."[39]

67.     The logical explanation for the absence of the three marker compounds despite the high level of vanillin is not because the Product lacks any vanilla, but that it contains a trace or *de minimis* amount such that these aromatic compounds are not detectable by advanced scientific means.

IV.     Front Label and Ingredient List Fail to Disclose Non-Vanilla and Artificial Flavors

68.     The flavor used by defendant is known in the trade as "Vanilla With Other Natural

---

[36] 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").
[37] *Id.*
[38] 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").
[39] John Wright, Flavor Bites: Piperonal in Flavors, Perfumer & Flavorist, June 1, 2015; *see* 21 C.F.R. § 182.60.

Flavors" ("Vanilla WONF").

69.    Assuming the Product contains some vanilla, the presence of non-vanilla vanillin and maltol in a disproportionate amount relative to the presence of the non-vanillin marker compounds means these components are added in the "WONF" portion of the flavor.

70.    The "WONF" flavor labeling structure is not applicable where a product's primary characterizing flavor is vanilla, because the vanilla standards take precedence over the general flavor regulations. *Compare* 21 C.F.R. § 101.22 with 21 C.F.R. § 169.175-21 C.F.R. § 169.182 (vanilla products).

71.    The vanilla standards permit only glycerin, propylene glycol, sugar, dextrose, corn sirup or vanillin to be added to vanilla, and control how such combinations should be named. *See* 21 C.F.R. § 169.175(a)(1)-(5) (ingredients permitted for addition to vanilla extract); *see also* 21 C.F.R. § 169.180(a) (permitting "not more than 1 ounce of added vanillin" for "each unit of vanilla constituent, as defined in 169.3(c)" in the combination labeled "Vanilla-vanillin extract.").

72.    The purpose of these requirements is to prevent a trace of vanilla from being spiked with artificial vanilla flavors such as vanillin.  Exhibit "B," Memorandum of Conference, Status of Vanilla Flavoring with other Natural Flavors, July 8, 1996 ("The vanilla standard determines vanilla as a standardized product. If other flavorings are added, then the vanilla is no longer a standardized product and should therefore be labeled artificial or imitation.")

73.    Defendant's "Natural Flavors" is a combination of vanilla, vanillin and "other natural flavors."

74.    Where vanillin is added to vanilla, "the specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'." *See* Vanilla-vanillin extract at 21 C.F.R. §

169.180(b).

75.   The Product's front label and ingredient list fail to disclose vanillin, an artificial flavor.

76.   According to representatives of FEMA:

The standards for vanilla extract and the other standardized vanilla products at 21 CFR 169 expressly do not provide WONF designation. This means that a flavoring mixture of vanilla extract and vanillin produced through a "natural" process (i.e. a process consistent with the definition of natural flavor at 21 CFR Section 101.22(a)(3)) cannot be described as "vanilla extract WONF," "vanilla WONF" or other similar descriptive terms.

Exhibit C, John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018.

77.   Including vanillin as part of the "WONF" portion of the "Natural Flavors" in the organic vanilla soymilk Product is misleading because it fails to disclose that vanillin is an artificial flavor when paired with vanilla.

78.    A reasonable consumer cannot follow up or learn the truth that the Product contains non-vanilla artificial vanillin from reading the Product's ingredient list because defendant labels this incorrectly and deceptively as "Other Natural Flavor" as opposed to "Artificial Flavor."

79.   For the Product to be accurately labeled as "Vanilla Almondmilk," it would have to "contain[s] no artificial flavor that simulates, resembles or reinforces the characterizing flavor" of vanilla. *See* 21 C.F.R. § 101.22(i)(l).

80.   Since the Product is made with vanillin, the label of "Vanilla Almondmilk" is false and misleading because the vanillin is "not made from vanilla beans or vanilla flavors made from vanilla beans." Exhibit C, FDA, Letter, Ferré-Hockensmith to Brownell, August 5, 2008, p. 2.

81.   Defendant's Vanilla Almondmilk "containing vanillin derived from a non vanilla bean source needs to be labeled as artificially flavored" because "the food is characterized/labeled

as vanilla flavored." Exhibit D, FDA, Letter, Margaret-Hanna Emerick to Richard Brownell, February 25, 2016; *see* 21 C.F.R. § 101.22(i)(2) (requiring a food that "contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor" to be labeled "artificially flavored").

82.   Assuming the "WONF" portion of defendant's "Natural Flavors" uses "vanillin derived naturally through fermentation," it is misleading to "imply that the vanillin is a natural flavor." Exhibit E, FDA Letter, Cataline Ferré-Hockensmith to Richard Brownell, April 19, 2005.

83.   Though a naturally derived vanillin may be designated "'natural flavor'" in the context of the general flavor regulations at 21 C.F.R. § 101.22, this is outside the context of the standardized vanilla ingredients "under sections 169.180, 169.181, and 169.182 in 21 CFR." Exhibit C, FDA, Letter, Cataline Ferré-Hockensmith, August 5, 2008, p. 2.

## V.  Products are Misleading Because They are Labeled and Named Similar to Other Products

84.   The following is an example of the product of defendant and competitor.

|       Competitor Product       |       Defendant's Product       |
| :----------------------------: | :-----------------------------: |

 

**INGREDIENTS:** Organic Almond Base (Filtered Water, Organic Almonds), Organic Vanilla Flavor, Sea Salt, Sunflower Lecithin, Organic Locust Bean Gum, Gellan Gum, Vitamin A Palmitate, Ergocalciferol (Vitamin D2), DL-Alpha-Tocopheryl Acetate (Vitamin E), Riboflavin (Vitamin B2), Zinc Gluconate, Cyanocobalamin (Vitamin B12).

**INGREDIENTS:** ALMONDMILK (FILTERED WATER, ALMONDS), EVAPORATED CANE SYRUP, TRICALCIUM PHOSPHATE, NATURAL FLAVORS, SEA SALT, GELLAN GUM, DIPOTASSIUM PHOSPHATE, XANTHAN GUM, SUNFLOWER LECITHIN, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA TOCOPHEROL (VITAMIN E).

**Ingredients**:  Organic  Almond  Base (Filtered Water, Organic Almonds), Organic Vanilla Flavor, Sea Salt, Sunflower Lecithin, Organic Locust Bean Gum, Gellan Gum, Vitamin  A  Palmitate,  Ergocalciferol (Vitamin D2), Dl-Alpha-Tocopheryl Acetate (Vitamin E), Riboflavin (Vitamin B2), Zinc Gluconate, Cyanocobalamin (Vitamin B12).

**INGREDIENTS:**  ALMONDMILK (FILTERED  WATER,  ALMONDS), EVAPORATED  CANE  SYRUP, TRICALCIUM PHOSPHATE, NATURAL FLAVORS,  SEA  SALT,  GELLAN GUM, DIPOTASSIUM PHOSPHATE, XANTHAN  GUM,  SUNFLOWER LECITHIN,  VITAMIN A  PALMITATE, VITAMIN D2, D-ALPHA TOCOPHEROL (VITAMIN E).

85.     The competitor product lists "Organic Vanilla Flavor" on its ingredient list and does not indicate the presence of other flavors not derived from vanilla, as defendant's Product does through the designation of "Natural Flavor."

86.     Products are required to be identified and labeled in a way consistent with other products of similar composition. *See* 21 C.F.R. § 102.5(a) ("General principles.") ("The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.").

87.     This framework assures consumers will not be misled by the quality and components of similarly labeled products where one product contains a greater amount, type and/or proportion of a characterizing and valuable ingredient.

88.     Where two products are identified by the same descriptive terms and noun such as "vanilla almondmilk" and where the front label has no other modifications of these terms, consumers will be deceived into purchasing the lower quality product under the false impression that it contains the equivalent amount of said ingredients or components.

89.     The competitor product and defendant's Product are sold in close proximity to each other and their identical names misleads consumers and plaintiff to expect that both products are identical in quality when the competitor product is of higher quality.

90.     Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

91.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like

plaintiff.

92.    The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

93.    Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

94.    As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.99 and $4.49 for cartons of 32 OZ and 64 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

VI.    Conclusion

95.    Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

96.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like plaintiffs.

97.    The value of the Product that plaintiffs purchased and consumed was materially less than their value as represented by defendant.

98.    Had plaintiffs and class members known the truth, they would not have bought the Product or would have paid less for them.

99.    As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.99 for cartons of 32 OZ and 64 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

100.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

101.   Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

102.   Plaintiff Glynis Wynn is a citizen of New York.

103.   Defendant Topco Associates, LLC is an Delaware corporation with a principal place of business in Elk Grove, Cook County, Illinois and therefore is a citizen of Illinois.

104.   "Minimal diversity" exists because plaintiff and defendant are citizens of different states.

105.   Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred, *viz*, the purchase of the Product and the misleading representations relied upon by plaintiff.

106.   This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

Parties

107.   Plaintiff Glynis Wynn is a citizen of Beacon, Dutchess County, New York. Plaintiff Katelynn Edgerly is a citizen of Saratoga Springs, Saratoga County, New York.

108.   Defendant Topco Associates, LLC is a Delaware limited liability company with a principal place of business in Elk Grove, Illinois, Cook County.

109.   Defendant sells a range of products to grocery stores nationwide.

110.   During the relevant statutes of limitations, plaintiffs purchased the Product within

22

their district and/or State for personal consumption and/or use in reliance on the representations the Product's flavor contained only vanilla flavoring from vanilla beans and did not contain artificial flavors.

111.   Plaintiffs purchased the Products at the Price Chopper Supermarkets nearest their homes in 2019 and 2020.

112.   Plaintiffs bought the Product because they liked the product type for its intended use and expected its vanilla flavor to not be enhanced by artificial flavors, because the front label did not disclose this nor was it clarified by the ingredient list.

113.   Plaintiffs would buy the Product again if assured it did not contain vanilla-enhancing ingredients in addition to vanilla and if it was labeled in a non-deceptive manner.

<u>Class Allegations</u>

114.   The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

115.   Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiffs and class members are entitled to damages.

116.   Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

117.   Plaintiffs are adequate representatives because their interests do not conflict with other members.

118.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

119.   Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest relative to the scope of the harm.

120.   Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

121.   Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL"), §§ 349 & 350
(Consumer Protection Statutes)

122.   Plaintiffs incorporate by reference all preceding paragraphs.

123.   Plaintiffs and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

124.   Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

125.   Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

126.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

127.   The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

128.   Plaintiffs relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

129.   Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

130.   Plaintiffs incorporate by reference all preceding paragraphs.

131.   Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

132.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

133.   The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

134.   Defendant had a duty to disclose and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

135.   This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

136.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

137.   Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

138.   Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

139.   Plaintiffs incorporate by reference all preceding paragraphs.

140.   The Product were manufactured, labeled and sold by defendant and warranted to plaintiffs and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

141.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

142.   The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

143.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

144.   This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

145.   Plaintiffs provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

146.   Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

147.   The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

148.   Plaintiffs and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

<u>Fraud</u>

149.   Plaintiffs incorporate by reference all preceding paragraphs.

150.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

151.   The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

152.   Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label and ingredient list, when it knew its statements were neither true nor accurate and misled consumers.

153.   Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

154.   Plaintiffs incorporate by reference all preceding paragraphs.

155.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

   **WHEREFORE**, Plaintiffs pray for judgment:

1.   Declaring this a proper class action, certifying plaintiffs as representatives and the

undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   June 26, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:19-cv-11104-RA
United States District Court
Southern District of New York

Glynis Wynn, Katelynn Edgerly, individually and on behalf of all others similarly situated,

Plaintiffs,

- against -

Topco Associates, LLC

Defendant

## First Amended Class Action Complaint

```
Sheehan & Associates, P.C.
  505 Northern Blvd Ste 311
  Great Neck NY 11021-5101
      Tel: (516) 303-0552
      Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  June 26, 2020

/s/ Spencer Sheehan
Spencer Sheehan